UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

MARISE HAMILTON,

                  Defendant.

**MEMORANDUM OPINION AND ORDER**

20-CR-00545 (PMH)

PHILIP M. HALPERN, United States District Judge:

    Marise Hamilton ("Defendant") stands charged in a single-count indictment of participating in a conspiracy to distribute and possess with intent to distribute one kilogram and more of heroin, 400 grams and more of fentanyl, and 28 grams and more of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (b)(1)(B), and 846. (Doc. 2).

    Defendant moves under Federal Rule of Criminal Procedure 12(b)(3) to: (1) suppress physical evidence recovered from his person and a black 2002 Honda Accord bearing New York license plate JMY6080 ("Honda") on May 21, 2020 and May 22, 2020; (2) controvert a warrant authorizing the search of the Honda (or, in the alternative, hold a *Franks* hearing); (3) controvert a warrant authorizing the search of a black Samsung smartphone bearing International Mobile Equipment Identity Number 354048112511150 and a black Samsung smartphone in a black and silver case (collectively, "Smartphones") recovered from the Honda (or, in the alternative, hold a *Franks* hearing); (4) suppress all electronically stored information ("ESI") retrieved from the Smartphones; and (5) preclude "irrelevant evidence" at trial. (Doc. 107 ¶¶ 2-6).[1]

---

[1] The motion also seeks suppression of "post-arrest statements" Defendant made to law enforcement on May 21, 2020 along with leave to join in pretrial "motions made by co-defendants . . . ." (Doc. 107 ¶¶ 1,7). The Government has represented that it does not intend to introduce the subject statements and no other party has filed a pretrial motion. These branches of Defendant's motion are, accordingly, denied as moot.

Defendant served and filed his motion papers on September 13, 2021. (*Id.*; Doc. 108; Doc. 109, "Hamilton Decl."; Doc. 110, "Def. Br."). The Government served and filed its opposition brief on October 13, 2021 (Doc. 112, "Gov't Br."), and the motion was briefed fully with the submission of Defendant's memorandum of law in further support of his motion on October 27, 2021 (Doc. 113, "Reply Br.").[2]

For the reasons set forth below, Defendant's motion is DENIED.[3]

## BACKGROUND

At approximately 7:20 p.m. on May 21, 2020, the Honda was parked in a lot on First Street in Newburgh, New York. (Street Vid. at 07:15:28-07:20:08; Def. Ex. B at USAO_040983 ¶ 6; Gov't Ex. 1 at USAO_040957). Defendant sat in the driver seat. (*See* Street Vid. at 07:24:45-07:24:47). The Honda was parked next to a makeshift tent where, at times, between one and four men milled about. (*Id.* at 07:15:28-07:20:08). As recorded by video viewing the rear of the Honda, at approximately 7:20 that evening, a white male wearing a black t-shirt approached the Honda's passenger door. (*Id.* at 07:20:08-07:20:14). After reaching the passenger door and appearing to understand a signal from within the Honda, the white male went around the back of the vehicle to the driver's side as Defendant opened the driver's side door. (*Id.* at 07:20:14-07:20:19).

---

[2] Both Defendant and the Government submitted exhibits as attachments to their memoranda. Defendant's first exhibit consisted of video submitted to the Court via USB drives. One set of those videos, retrieved from street surveillance footage, is cited herein as "Street Vid. at ____." The other video, retrieved from body camera footage, is cited herein as "Body Vid. at ____." Defendant's remaining exhibits, like the Government's exhibit, are cited in conformity with the designation ascribed by the party (i.e., "Def. Ex. B" or "Gov't Ex. 1").

[3] The Court held adjudication of this motion in abeyance, at the parties' request, while Defendant explored the possibility of a pretrial resolution. (*See* Nov. 2, 2021 Min. Entry ("Counsel for Defendant Hamilton confirmed that the Court should not yet address the pending pretrial motion given pretrial resolution discussions.")). The Court was advised during the March 10, 2022 conference, however, that the parties failed to reach such a resolution and that this motion was ripe for adjudication. (*See* Mar. 10, 2022 Min. Entry ("Counsel for Defendant Hamilton and the Government confirmed that the Court should resolve the pending pretrial motion.")). The following day, March 11, 2022, this Court issued an Order setting forth pretrial submission dates leading up to the anticipated August 1, 2022 trial. (Doc. 150).

It is unclear what transpired once the white male reached the driver's side door because the camera's view was obstructed by a black grill. The following is, however, indisputable based on the footage: (1) after arriving at the open driver's side door, the white man leaned on the door with his left hand and put his right hand (which had been in his pants' right pocket the entire time the white male was on the screen) into the Honda; and (2) the white man spoke with Defendant. (*Id*. at 07:20:19-07:20:42). This interaction lasted approximately twenty seconds as the men in the tent looked on. (*Id*.). The white male then walked away from the Honda and paced nearby, in and out of the camera's view, for less than one minute. (*Id*. at 07:20:42-07:21:28). Then, over roughly five seconds, Defendant opened the driver's side door, the white male approached the Honda, reached into the vehicle through the open driver's side door with his right hand, took something from within the Honda, and walked away quickly as he put his right hand back into his pocket. (*Id*. at 07:21:28-07:21:33).

Sergeant Christopher Lahar ("Lahar") of the City of Newburgh Police Department ("NPD") observed this interaction watching the same footage that was provided to the Court and confirmed that the license plate attached to the Honda's rear belonged to a different vehicle. (Def. Br. at 16-17; Def. Ex. B at USAO_040983 ¶ 6). With this knowledge, his observation of the interaction at the Honda, and the fact that this location is known for narcotics transactions, Lahar reported his observations to his NPD colleagues in the area. (Def. Br. at 5-6; Def. Ex. B at USAO_040983 ¶¶ 6-7; Gov't Ex. 1 at USAO_040957). NPD Sergeant Anthony Giudice ("Giudice") responded to the scene in a marked white NPD pick-up truck a little more than two minutes after the white male walked away from the Honda. (Street Vid. at 07:24:42).

As Giudice and other officers converged on the Honda, but before officers could reach it, Defendant exited the driver's side door and stood up. (*Id*. at 07:24:45-07:24:46). As Defendant

exited the Honda, he approached law enforcement, put his left hand behind his back, and was met by Giudice and NPD Officer Juan Alonzo ("Alonzo"). (*Id.* at 07:24:45-07:24:51; *see also* Def. Ex. B at USAO_040983 at ¶ 7 (identifying Alonzo as the officer who approached with Giudice)). Giudice and Alonzo grabbed Defendant's arms—Giudice on Defendant's right, Alonzo on Defendant's left—and led Defendant away from the Honda to the front of the NPD pick-up truck that Giudice parked behind the Honda. (Street Vid. at 07:24:51-07:25:00). Defendant had wads of folded cash cupped inside his left hand. (Body Vid. at 01:20-01:25).[4] After walking Defendant to the front of the NPD pick-up truck, Alonzo handcuffed and frisked Defendant. (*Id.* at 01:25-01:40).

As Alonzo frisked Defendant, the latter became belligerent. Defendant yelled, *inter alia*, "Stop grabbin' my fuckin' dick!" and, "He grabbed my dick, bro!" (*Id.* at 02:34-02:39). As shown in the street surveillance footage, Defendant struggled against Alonzo when he yelled and Alonzo pressed Defendant against the NPD pick-up truck to regain control. (Street Vid. at 07:26:00-07:26:12). As Defendant yelled, Giudice turned back to him and said, "Mouse, relax. Alright. Take it easy." (Body Vid. at 02:39-02:43). Defendant yelled in response, "You know me, bro!" Giudice affirmed (as Defendant talked over him), "Yeah, I know you. You don't have anything on you, you'll be alright." (*Id.* at 02:43-02:46). Defendant continued yelling and declared, "No, go ahead, bro, you can search me! You search me, bro! You can search me, bro!" (*Id.* at 02:46-02:51). Giudice, at this point, walked away from Alonzo and Defendant. (*Id.* at 02:51-04:20). Even though Giudice walked away, his body camera captured Defendant yelling about how law enforcement touched him inappropriately. (*See, e.g.*, *id.* at 03:24-03:50).

When Giudice walked back to Defendant and Alonzo at the front of the NPD pick-up truck, six officers—in addition to Giudice—are visible. (*Id.* at 04:26). As Giudice approached, he asked

---

[4] Citations to the video retrieved from Giudice's body camera correspond to the timestamps generated by Windows Media Player.

Defendant who owned the Honda, and Defendant answered, "That's my mother's car." (*Id*. at 04:26-04:32). Defendant continued, without prompting, "There's nothin' in there." (*Id*. at 04:32-04:36). After Giudice asked a female bystander multiple times to move out of the way, Defendant explained that his mother owned the Honda and that his uncle lived on the second floor of an adjacent apartment building. (*Id*. at 04:36-05:01). Giudice asked Defendant, "Anything in the car?" (*Id*. at 05:05-05:07). Defendant responded, "Nothing in the car, bro." (*Id*. at 5:07-05:08). Giudice asked, "You slinging weed?" (*Id*. at 05:08-05:09). Defendant admitted that he "sold K2." (*Id*. at 05:09-05:13). Giudice continued, "Okay. Is there anything in the car?" (*Id*. at 05:12-05:13). Defendant insisted, "There's nothing in the car, bro. I wouldn't lie to you, bro." (*Id*. at 05:12-05:14). Giudice said, "Alright," and before he could finish his sentence, Defendant declared, "You can search." (*Id*. at 05:14-05:15). Giudice responded, "We're gonna take a quick look. As long as there's nothing in there, we're good." (*Id*. at 05:16-05:19). Defendant emphasized, "I'm giving you permission to check the car, bro." (*Id*. at 05:19-20).

Giudice approached the Honda's driver's side door, moved a bucket and the grill out of the way, and looked inside the open driver's side door. (*Id*. at 05:29-06:08). Leaning into the Honda—as revealed by the video—Giudice observed loose cash strewn about and immediately recovered a rock of crack cocaine from the driver seat. (*Id*. at 06:08-06:14; *see also* Hamilton Decl. ¶ 7 ("I had property inside the Honda including crack-cocaine, money, two black Samsung Smartphones and other property which belonged to me.")). Both Defendant and the individual who was sitting in the Honda's passenger seat when police arrived were then taken into custody. (*Id*. at 06:14-07:15). Law enforcement recovered 34.7 grams of crack cocaine and 1.8 grams of fentanyl, hidden in Defendant's crotch, at NPD headquarters. (Def. Br. at 8; Hamilton Decl. ¶ 10 ("I had money in my hand and drugs inside my pants."); Def. Ex. B at USAO_040983-4 ¶ 9).

Following the events that unfolded in the parking lot, NPD towed the Honda to NPD headquarters. (Street Vid. at 08:06:35-08:13:06). The day after the interaction, May 22, 2020, Giudice secured a search warrant for the Honda from the Newburgh City Court. (Def. Ex. B at USAO_040979-84). The resultant search yielded additional narcotics, money, the Smartphones, and an electronic scale. (Def. Br. at 8; Gov't Ex. 1 at USAO_040958). Approximately seven months later, on December 23, 2020, Magistrate Judge Judith C. McCarthy issued a warrant for the Smartphones' ESI. (Def. Ex. C at USAO_009234-49).[5]

## ANALYSIS

The Court considers the various branches of Defendant's motion *seriatim*.

I. <u>Suppression of Physical Evidence Recovered from the Honda and Defendant's Person</u>

The first branch of Defendant's argument (i.e., suppression of physical evidence recovered from the Honda and Defendant's person on May 21, 2020 and May 22, 2020) presents three considerations: (1) whether law enforcement had reasonable suspicion to effect the initial investigatory stop; (2) whether the stop ever ripened into a *de facto* arrest; and (3) whether the consent that Defendant gave Giudice to search the vehicle was voluntary. (*See* Def. Br. at 10-19).[6]

   A. <u>The Initial Stop</u>

The Fourth Amendment provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,

---

[5] Magistrate Judge Lisa M. Smith issued a search warrant for the Smartphones on May 27, 2020. (Def. Ex. C at USAO_009241 ¶ 7). The attempt to extract ESI from the Smartphones before the warrant expired failed, however, because law enforcement could not bypass the devices' security measures. (*Id*. ¶¶ 8-9).

[6] Defendant's notice of motion indicates that this branch of the motion seeks suppression of physical evidence recovered from Defendant's person and the Honda on May 21, 2020 *and* May 22, 2020. (Doc. 107 ¶ 2). The Court limits its discussion herein to the contraband recovered from the Honda during the stop, as any additional evidence recovered from the Honda was the product of the search warrant issued by the Newburgh City Court (and is, therefore, more properly considered with respect to those branches of the motion seeking to controvert that warrant and suppress the resulting evidence).

shall not be violated . . . ." U.S. Const. amend. IV. As that "text makes clear, the concept of reasonableness is the touchstone of constitutionality of a governmental search. What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *MacWade v. Kelly*, 460 F.3d 260, 267-68 (2d Cir. 2006) (internal citations and quotation marks omitted). "Warrantless searches and seizures are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Weaver*, 9 F.4th 129, 138 (2d Cir. 2021) (internal quotation marks omitted). One of these exceptions is an investigatory stop and frisk permitted by *Terry v. Ohio*, 392 U.S. 1 (1968).

Under *Terry* and its progeny, "a brief investigatory stop may sometimes reasonably be conducted in the absence of a warrant and even of the probable cause required for a lawful arrest." *United States v. Patterson*, 25 F.4th 123, 135 (2d Cir. 2022) (citing *Terry*, 392 U.S. at 20; *United States v. Bailey*, 743 F.3d 322, 331-32 (2d Cir. 2014)). In sum, "if a police officer has a reasonable suspicion of criminal wrongdoing, then the police officer may briefly detain a suspect for investigative purposes (*e.g.*, for questioning) and may also conduct a frisk or a patdown of the person to assure the officer's personal safety during the stop if the officer has reasonable grounds to believe the suspect to be armed and dangerous." *United States v. Robertson*, 239 F. Supp. 3d 426, 442 (D. Conn. 2017). As for what constitutes "reasonable suspicion" to conduct such a stop, the Second Circuit explained recently that:

> [l]ike probable cause, reasonable suspicion is a commonsense, nontechnical conception not readily, or even usefully, reduced to a neat set of legal rules. Unlike the finely-tuned standards for proof by a preponderance of the evidence or beyond a reasonable doubt, probable cause and reasonable suspicion are fluid concepts, which take their substantive content from the particular contexts in which the standards are being assessed. Thus, neither probable cause nor

> reasonable suspicion requires the more-likely-than-not showing demanded by the preponderance standard.

*Patterson*, 25 F.4th at 135 (cleaned up). Thus, reasonable suspicion "requires more than a hunch" and "is satisfied as long as authorities can point to specific and articulable facts which, taken together with rational inferences from those facts, provide a particularized and objective basis for suspecting legal wrongdoing." *Id*. at 136 (internal citations and quotation marks omitted). Courts consider "the totality of the circumstances and must evaluate those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016); *see also United States v. Lee*, 916 F.2d 814, 820 (2d Cir. 1990) ("[T]he proper inquiry is not whether each fact considered in isolation denotes unlawful behavior, but whether all the facts taken together support a reasonable suspicion of wrongdoing."); *United States v. Torres*, 252 F. Supp. 3d 229, 237 (S.D.N.Y. 2017) (Sullivan, J.) (observing that the reasonable suspicion standard "is 'not a difficult one to satisfy'" (quoting *United States v. Oates*, 560 F.2d 45, 63 (2d Cir. 1977)).

The videos leave no doubt as to what law enforcement observed and, when considered against the standard outlined above, the Court must conclude that reasonable suspicion existed to believe that Defendant participated in a narcotics transaction. Defendant concedes that the Honda was parked in an area known for narcotics activities. (Def. Br. at 11 (noting that law enforcement claimed their suspicion was heightened as the parking lot was a "known narcotics location"), 13 (listing, as an "unembellished fact" available to officers, that "the parking lot was a 'known narcotics location'")). Immediately before officers approached the Honda, the video reveals the unknown white male going to the parked car—a vehicle whose license plates did not match the vehicle—with his right hand in his pants' right pocket. The white male interacted with Defendant and, during that interaction, reached into the vehicle with his right hand. Defendant closed the

8

driver's side door, the white male paced nearby, Defendant opened the driver's side door, the men interacted, the white male took something from Defendant, put that item into his right pocket with his right hand, and walked away quickly. This says nothing of the fact that the men milling about the tent looked on throughout the interaction. (Street Vid. at 07:20:08-07:21:33). All of this activity happened in just over one minute and the video certainly permits the reasonable belief that the white male acted quickly with a purpose to complete the interaction and leave. (*Id.*).

All of these facts, along with the rational inferences permitted, certainly provide *at least* an objective basis for suspecting criminal activity and effectuating a *Terry* stop to inquire further. *See, e.g.*, *United States v. Bayless*, 201 F.3d 116, 134 (2d Cir. 2000) (finding officers' observation of four men loading duffel bags quickly into a car, without interacting, and then departing quickly was a "weighty factor" that provided "a specific basis for the police officers' suspicion that they were witnessing an illicit transaction that the participants did not want to prolong"); *Morales v. Greiner*, 381 F.3d 47, 47-48 (2d Cir. 2004) (finding *probable cause* established where the defendant was observed "touching hands" with four other people in the vestibule of a building in an area known for narcotics activity, the four other people were seen departing quickly thereafter, and officers saw one person holding a glassine envelope commonly used to package narcotics); *United States v. Garcia*, No. 18-CR-00178, 2018 WL 3407707, at *4 (S.D.N.Y. June 5, 2018) (concluding that reasonable suspicion was supported by, *inter alia*, the fact that the defendant's car did not match its license plate); *United States v. Matos*, No. 17-CR-00182, 2017 WL 5989203, at *5-6 (S.D.N.Y. Dec. 4, 2017) (finding stop "amply supported by *probable cause*" where officer observed, at night, the defendant remove something from his jacket, exchange it for money in a high-crime area known for narcotics transactions, and thereafter grab his waistband (emphasis added)); *Daniels v. City of New York*, No. 15-CV-02251, 2016 WL 4368378, at *4 (S.D.N.Y. Aug.

14, 2016) (Sullivan, J.) (finding *probable cause* existed where law enforcement saw individuals, in an area with reports of narcotics activity, saw the plaintiff exchange "what appeared to be US currency" for a "small object"); *United States v. Vasquez*, 297 F. Supp. 2d 696, 698 (S.D.N.Y. 2004) (finding *probable cause* where police saw defendant, sitting in a car in an area known for drug sales, reach into his dashboard twice, retrieve something, and exchange the object with another person for money).

This result reflects the reality that "reasonable suspicion can arise even where a defendant's conduct is as consistent with innocence as with guilt so long as there is some indication of possible illicit activity. Indeed, if officers had observed actual prohibited conduct, they would have had probable cause to arrest." *United States v. Singletary*, 798 F.3d 55, 62 (2d Cir. 2015) (internal citations and quotation marks omitted). As the Supreme Court has observed:

> [t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an immediate response.

*Adams v. Williams*, 407 U.S. 143, 145 (1972).

To the extent Defendant seeks to suppress any evidence recovered as a result of an unlawful investigatory stop, that motion is denied.[7]

### B. *De Facto* Arrest

An investigatory stop must, however, be "limited to the degree of intrusion necessary to confirm or dispel the reasonable suspicion that justifies the stop in the first place." *Grice v. McVeigh*, 873 F.3d 162, 167 (2d Cir. 2017). Consequently, a stop "requiring reasonable suspicion

---

[7] The parties argue over whether law enforcement had probable cause to believe a crime had been committed when they approached the Honda. (*See* Def. Br. at 10-11; Gov't Br. at 16-20). Given the Court's conclusion with respect to the presence of reasonable suspicion, it need not and does not address the heightened standard of probable cause.

may ripen into a *de facto* arrest requiring probable cause 'if the means of detention are more intrusive than necessary.'" *Hawthorne ex rel. Hawthorne v. Cty. of Putnam*, 492 F. Supp. 3d 281, 295 (S.D.N.Y. 2020) (quoting *United States v. Tehrani*, 49 F.3d 54, 61 (2d Cir. 1995)). When assessing whether a stop has ripened into an arrest, factors considered include:

> (1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person stopped; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons.

*Patterson*, 25 F.4th at 140-41 (quoting *United States v. Fiseku*, 915 F.3d 863, 870 (2d Cir. 2018)). No single factor is determinative. *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004).

The totality of the circumstances do not support concluding that a *de facto* arrest occurred, as consideration of the factors listed above lay bare. First, approximately five minutes elapsed from the moment officers arrived on the scene until Giudice discovered the crack cocaine. (*See* Street Vid. at 07:24:45-07:29:50). Second, the stop occurred in an open parking lot. (*See generally id.*). Third, there were, at most, seven officers on the scene during the stop's five-minute interval. (Body Vid. at 04:26).[8] Fourth, as law enforcement approached, Defendant got out of the Honda, put his left hand behind his back, and approached Giudice and Alonzo. (Street Vid. at 07:24:45-07:24:51; Body Vid. at 01:14-01:18). Fifth, the footage confirms that the use of handcuffs was linked to Defendant's behavior upon seeing officers approach. (Street Vid. at 07:24:50-07:25:00; Body Vid. at 01:17-01:35).[9] Nothing about the totality of these circumstances suggests that this *Terry* stop ripened into an arrest before the crack cocaine was found. *See, e.g.*, *United States v. Santillan*, 902

---

[8] Up to ten officers from various agencies are visible well after Defendant gave consent. (Street Vid. at 07:33:21).

[9] Notably, Defendant became belligerent after the handcuffs were fastened, insisting both that he was touched inappropriately and volunteering that there was nothing in the car. (*See* Body Vid. at 02:34-03:50).

11

F.3d 49, 59 (2d Cir. 2018) ("Narcotics activity and weapons often go hand in hand, and the type of investigative detention at issue here is fraught with danger for the officer." (internal citation omitted)); *United States v. Foreste*, 780 F.3d 518, 526 (2d Cir. 2016) (finding investigative stops, which lasted "only twenty-two minutes," reasonable "to dispel . . . suspicion"); *Bailey*, 743 F.3d at 336 ("Here, we deal with a stop lasting a total of ten minutes before police sufficiently confirmed their suspicions to arrest Baily on undisputed probable cause. We conclude that such a brief detention did not exceed the permissible scope of a *Terry* stop simply because, for its last few minutes, police were not questioning Bailey but, rather, were awaiting the results of a court-authorized search . . . ."); *Newton*, 369 F.3d at 674-75.

Based upon the foregoing, given the totality of the circumstances, officers applied the least intrusive means available to effectuate their investigative purpose. Accordingly, the Court concludes that the *Terry* stop did not ripen into an arrest before the crack cocaine was found.

    C. <u>Voluntariness of Consent to Search the Honda</u>

A second exception to the warrant requirement exists when a search is conducted pursuant to the voluntary consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."); *Katz v. United States*, 389 U.S. 347, 358 n.22 (1967) ("A search to which an individual consents meets Fourth Amendment requirements . . . ."). "Consent is voluntary if it has not been coerced, by explicit or implicit means, by implied threat or covert force and is not granted only in submission to a claim of lawful authority." *United States v. Garcia*, No. 19-CR-00410, 2021 WL 3516447, at *5 (E.D.N.Y. Aug. 10, 2021) (internal quotation marks omitted). On this score, Defendant argues that he did not give consent to search

the Honda willfully. (*See* Def. Br. at 15-19; Hamilton Decl. ¶ 11 ("I gave police verbal permission to search the Honda. This permission was given under duress . . . .")).

Evaluating whether consent to conduct a search was voluntary asks the Court to determine "ultimate[ly] . . . whether the officer had a reasonable basis for believing that there had been consent to the search." *United States v. O'Brien*, 926 F.3d 57, 77 (2d Cir. 2019) (quoting *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995)). "Voluntariness is a question of fact to be determined from the totality of all the circumstances, both the characteristics of the accused and the details of the interrogation." *United States v. Ofsink*, No. 19-CR-00290, 2021 WL 457230, at *10 (E.D.N.Y. Feb. 8, 2021) (internal quotation marks and citations omitted); *see also United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018) ("Consent may be express or implied."); *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981) (explaining that "consent may be inferred from an individual's words, gestures, or conduct"). While no single factor is decisive, the Court considers, for example:

> "age, education, intelligence, length of detention, use of physical punishments or deprivations, and whether the alleged consenting person was advised of his constitutional rights," and where the person whose consent was allegedly given was in custody, whether "guns were drawn or the consenting individual was frisked . . . [or] threatened, was in a public area, or was informed that he had the option of refusing consent to the search."

*United States v. Collins*, No. 19-CR-00395, 2020 WL 5439658, at *3 (S.D.N.Y. Sept. 9, 2020) (quoting *United States v. Puglisi*, 790 F.2d 240, 243-44 (2d Cir. 1986) (alterations in original)). Where, as here, law enforcement relies on consent, it bears the burden of establishing consent by a preponderance of the evidence. *United States v. Cacace*, 796 F.3d 176, 189 (2d Cir. 2015); *United States v. Snype*, 441 F.3d 119, 131 (2d Cir. 2006)).

The body camera video carries the Government's burden in this particular case. That video reveals that Defendant, upon being frisked—presumably because he was hiding crack cocaine in his pants—struggled and became belligerent, shouting that Alonzo fondled his crotch. (*See* Body Vid. at 02:34-02:51, 03:24-03:50). None of the officers drew their weapons. (*Id*. at 04:20-05:19). The interaction happened during daylight hours in an open parking lot. (*See generally id*.). It appears, moreover, that Giudice and Defendant knew each other before this interaction, given the familiarity of the interaction (i.e., Giudice calls Defendant by his nickname, "Mouse," and Defendant insists to Giudice, "You know me!"). (*See id*. at 02:40-46). At no point during the interaction did Giudice ask to search the Honda or tell Defendant that a search would be conducted. (*See generally id*.). Rather, it was Defendant himself who interrupted Giudice midsentence and volunteered spontaneously, "You can search. I'm giving you permission to check the car, bro." (*Id*. at 05:14-05:20).

Absolutely nothing about this interaction suggests that consent was coerced. Rather, quite the opposite is true. This is a textbook example of consent without application of coercion or intimidation of any kind. *See, e.g.*, *United States v. Ansaldi*, 372 F.3d 118, 129-30 (2d Cir. 2004) (consent given voluntarily when a DEA agent asked, "Do you mind if we search?" and the handcuffed defendant replied, "Sure, go ahead"), *abrogated on other grounds by McFadden v. United States*, 576 U.S. 186 (2015); *United States v. Moreno*, 701 F.3d 64, 77 (2d Cir. 2012) ("Here, Marin did not hesitate when the agents requested her consent but immediately gave them permission to search . . . . Marin may have hoped to dissuade the officers from searching with this information, or she may have been confident that the heroin . . . would be overlooked . . . ."). Indeed, as Judge Engelmayer observed in a different case some eight years ago:

> [t]he most compelling evidence of the voluntariness of the consent is the manner in which it was given. The police at no point asked

> Jajaga for consent to search the vehicle; rather, Gruppuso asked whether there was anything in the vehicle that should not have been there. Jajaga first responded directly to the question, answering, falsely as it later turned out, "no." In answering no, Jajaga demonstrated that he was fully able to resist telling the police about the existence of items about which he did not want them to know. Moreover, Jajaga went beyond the scope of the actual question asked, and offered, of his own accord, the police the opportunity to have a look for themselves.

*United States v. Fiseku*, No. 15-CR-00384, 2015 WL 7871038, at *17 (S.D.N.Y. Dec. 3, 2015), *aff'd*, 915 F.3d 863 (2d Cir. 2018); *see also, e.g.*, *O'Brien*, 926 F.3d at 77-78.

The video shows that there was no reason to doubt the voluntariness of Defendant's consent. Defendant might have hoped that talking like a man with nothing to hide and granting permission to search the Honda would dissuade Giudice from accepting that invitation. Defendant lost that gamble and the fact that Giudice took Defendant up on the offer by searching the Honda does not retroactively render the consent involuntary.[10]

II. <u>Validity of the Search Warrants and the Evidence Obtained Therefrom</u>

The next three branches of Defendant's motion insist that the two search warrants must be controverted, and their fruits suppressed, because their issuance relied on false statements. (Def. Br. at 19-25). Specifically, with respect to the May 22, 2020 search warrant issued by the Newburgh City Court, Defendant complains that Giudice stated falsely that: (1) Lahar recognized

---

[10] Defendant argues also that the plain view exception does not apply with respect to the crack cocaine. (Def. Br. at 14-15). Given the Court's conclusion that Defendant voluntarily consented to the search of the Honda, it need not and does not address this argument. Moreover, while Defendant concedes that probable cause existed when Giudice recovered the crack cocaine, he seeks to minimize the import of the discovery, characterizing it consistently as "tiny." (*See* Def. Br. at 18 ("The police . . . lacked probable cause to charge him with any crime until they . . . found crack."); *id.* at 5, 8, 12-15, 21). The quantity of illegal narcotics recovered from the Honda does not change the fact that, upon discovering the crack cocaine, Giudice and his colleagues had probable cause to arrest Defendant. It bears noting also that while Defendant sought suppression of physical evidence taken from his person, he makes no specific argument pertaining to the search that revealed the drugs tucked away in his pants. (*See generally* Def. Br.; Reply Br.). This omission, in effect, concedes the legality of the search once probable cause to arrest undoubtedly attached.

Defendant's interaction with the white male as "a hand-to-hand narcotics transaction;" and (2) he observed "a rock of crack/cocaine" when Defendant exited the Honda. (Def. Br. at 21). As for the December 23, 2020 warrant secured from Magistrate Judge McCarthy, Defendant insists that the supporting affidavit claimed falsely that: (1) Lahar observed a "hand to hand [narcotics] narcotics transaction"; and (2) Giudice, upon approaching the Honda, "observed a scale covered in a white powdery residue" as well. (*Id.* at 23-24).

Affidavits submitted in support of a search warrant application are "presumed reliable," *United States v. Klump*, 536 F.3d 113, 119 (2d Cir. 2008), and the task of a court charged with deciding to issue a warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before [it] . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place," *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008) (Sotomayor, J.) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983) (second alteration in original)). When reviewing the decision to grant a warrant, given the nature of probable cause, "a reviewing court generally accords substantial deference to the finding of an issuing judicial officer that probable cause exists, limiting [its] inquiry to whether the officer had a substantial basis for his determination." *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015) (internal quotation marks omitted); *see also Kanciper v. Lato*, 718 F. App'x 24, 27 (2d Cir. 2017) (explaining that "the duty of a court reviewing the validity of a search warrant is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed" (internal quotation marks omitted)). As explained by then-Circuit Judge Sotomayor:

> the way a defendant demonstrates that statements in an affidavit . . . misled a district court is through a *Franks* hearing. In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court held that although a presumption of validity attaches to a law enforcement affidavit, in certain circumstances, a defendant is entitled to a hearing to test the veracity of the affiant's statements. Specifically,

> the Court held that the Fourth Amendment entitles a defendant to a hearing if he or she makes a substantial preliminary showing that a deliberate falsehood or statement made with reckless disregard for the truth was included in the warrant affidavit and the statement was necessary to the judge's finding of probable cause.

*Falso*, 544 F.3d at 125 (internal citation and quotation marks omitted); *see also United States v. Gibeault*, No. 20-01003-CR, 2021 WL 5816138, at *3 (2d Cir. Dec. 8, 2021) (affirming the trial court's conclusion that a *Franks* hearing was not warranted given the defendant's failure to "make a substantial preliminary showing" as to the two elements); *Ganek v. Leibowitz*, 874 F.3d 73, 81 (2d Cir. 2017) (explaining that the presumption that a warrant issued upon probable cause "can be defeated by showing that a defendant (1) knowingly and deliberately, or with a reckless disregard of the truth, procured the warrant, (2) based on false statements or material omissions, that (3) were necessary to the finding of probable cause" (internal quotation marks omitted)).

Defendant's submission falls well short of the "substantial preliminary showing" required to justify a *Franks* hearing. Even if the Court presumes that Defendant made the showing as to the first element—and Defendant's submissions have not established, with the requisite showing, that the subject statements were made deliberately or recklessly—Defendant's request fails clearly at the second step. That step asks the Court to "disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant." *United States v. Canfield*, 212 F.3d 713, 718 (2d Cir. 2000) (internal quotation marks omitted).

Probable cause to issue the warrants was clearly present, even if the Court disregards the allegedly false statements.

With respect to the May 22, 2020 warrant, if the Court excises the allegedly false statements (i.e., that Lahar *observed* a narcotics transaction and that Giudice observed a rock of crack cocaine *when* Defendant exited the Honda), the supporting affidavit presents the following undisputed facts: (1) the license plates on the Honda were not associated with that vehicle; (2) an

unknown man was observed giving something to, and receiving something from, a person inside the Honda; (3) Defendant had $500 in cash in his hand when he exited the Honda; (4) the Honda's other occupant had $6,564 in cash on his person; (5) a rock of crack cocaine *was* recovered from inside the Honda; (6) the crack cocaine recovered from the Honda was tested and the presence of cocaine base was confirmed (after Defendant told Giudice that it was "real"); and (7) 34.7 grams of a substance confirmed to be crack cocaine and 1.8 grams of a substance confirmed to be fentanyl were retrieved from Defendant's "groin area" following a search of his person at NPD headquarters. (Def. Ex. B at USAO_040983-84 ¶¶ 6-9).

The analysis pertaining to the December 23, 2020 warrant is virtually identical. If the Court ignores the disputed statements (i.e., that Lahar *observed* a narcotics transaction and that Giudice saw a scale covered in white powder inside the car *upon his approach*), the following facts remain: (1) Lahar saw an interaction between an unknown male and a person sitting in the Honda's driver seat; (2) when Giudice approached the Honda, he saw "what appeared to be thousands of dollars of cash scattered about the Honda;" (3) Defendant had $500 in cash in his hand; (4) the other occupant of the Honda had $6,564 in cash on his person; (5) "approximately 34 grams" of a substance that tested positive for cocaine base and "approximately 1.8 grams" of a substance that tested positive for fentanyl were recovered from Defendant's person; (6) the Smartphones and $2,630 in cash were recovered from the Honda after executing the May 22, 2020 warrant; (7) Defendant was observed engaging in hand-to-hand transactions in the parking lot *before* May 21, 2020; and (8) a grand jury indicted Defendant for participating in a narcotics conspiracy. (Def. Ex. C at USAO_009242-43 ¶¶ 11(b), (d)(i)-(iii), 12-15). The affiant, an FBI Special Agent, explained that based upon his experience, he expected the Smartphones to contain evidence of criminal

activity because people engaging in narcotics conspiracies commonly use their electronic devices to communicate with co-conspirators and conduct business. (*Id*. at USAO_009244 ¶¶ 16-18).

The burden Defendant faces here—a substantial preliminary showing—cannot be met on these facts. The Court is convinced that each of these submissions, even without the purportedly false statements, support probable cause to issue the associated warrants. There is no basis, given this conclusion, for a *Franks* hearing. *See United States v. Frazier*, No. 19-CR-00307, 2020 WL 6263312, at *12 (D. Conn. Oct. 23, 2020).

The branches of Defendant's motion to controvert the warrants and suppress the evidence obtained therefrom—or, in the alternative, to hold a *Franks* hearing—are, therefore, denied.

III. Preclusion of Irrelevant Evidence

The final branch of Defendant's motion asks that the Court "[p]reclud[e] the Government from using any irrelevant evidence obtained as fruits of [Defendant's] May 21, 2020 arrest . . . and . . . any evidence obtained by the Government post-dating the conspiracy period . . . ." (Doc. 107 ¶ 6). Defendant makes his argument based on Federal Rules of Evidence 401, 402, and 403. (Def. Br. at 25-28). This motion is, effectively, a premature motion *in limine*.[11] "Some of [the] testimony and evidence may well be relevant and not unfairly prejudicial. Other portions, and perhaps argument stemming therefrom, may be relevant but unfairly prejudicial under Rule 403. Without hearing the evidence in context, this Court cannot enter a blanket pretrial ruling." *United States v. Rounds*, No. 10-CR-00239, 2015 WL 5918372, at *1 (W.D.N.Y. Oct. 9, 2015). This branch of the motion is, accordingly, denied without prejudice to renew at the appropriate time.

---

[11] Motions *in limine* are to be filed on May 6, 2022. (Doc. 150 ¶ 2).

## CONCLUSION

For the foregoing reasons: (1) the first and seventh branches of the motion (i.e., suppressing post-arrest statements made on May 21, 2020, and joining in codefendants' pretrial motions) are DENIED AS MOOT; (2) the sixth branch of the motion (i.e., precluding irrelevant evidence at trial) is DENIED WITHOUT PREJUDICE TO RENEW; and (3) the remaining branches of the motion (i.e., suppressing evidence and controverting search warrants) are DENIED.

As noted during the March 10, 2022 conference, time has been excluded under the Speedy Trial Act pending resolution of the instant motion. As the motion has been adjudicated, time is no longer excluded as of the date of this Memorandum Opinion and Order. The parties are directed to file jointly a Proposed Order Excluding Time Under the Speedy Trial Act forthwith.

The Clerk of the Court is respectfully directed to terminate the motion sequence pending at Doc. 107.[12]

**SO ORDERED:**

Dated: White Plains, New York
April 19, 2022

_____
PHILIP M. HALPERN
United States District Judge

---

[12] "[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Cantoni*, No. 19-4358-CR, 2022 WL 211211, at *3 (2d Cir. Jan. 25, 2022) (quoting *United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005) (alteration in original)). No hearing is, however, necessary in this case because there are no "contested issues of fact that must be resolved in order for this Court to rule on [the] motion to suppress." *United States v. Holt*, No. 21-CR-00080, 2021 WL 5281366, at *2 (D. Conn. Nov. 12, 2021); *see also United States v. Merced*, No. 19-CR-00832, 2021 WL 5647827, at *11 (S.D.N.Y. Nov. 30, 2021).